[Cite as *State v. Martin*, 2019-Ohio-22.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NOS. 2017-L-005** **2017-L-006** |
| KEVIN L. MARTIN, | : | |
| Defendant-Appellant. | : | |

Criminal Appeals from the Lake County Court of Common Pleas, Case Nos. 2016 CR 000593 and 2016 CR 000633.

Judgment: Affirmed.

*Charles E. Coulson,* Lake County Prosecutor, *Teri R. Daniel,* and *Kelsey R. Lutz,* Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Edward M. Heindel*, 400 Terminal Tower, 50 Public Square, Cleveland, OH 44113 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Kevin L. Martin, appeals his convictions for various offenses following separate jury trials in the Lake County Court of Common Pleas. The issues before this court are whether a court abuses its discretion when it refuses to allow a defendant to plead guilty to a single count of a multiple-count indictment on the day of trial where the defendant gains no benefit by pleading and suffers no prejudice by having the charge tried; whether a court commits plain error by not severing certain

counts from an indictment where the evidence supporting the various counts is simple and direct; whether a court abuses its discretion by denying a motion to disqualify appointed counsel where the defendant and counsel disagree about trial strategy; whether the defendant's identity as the perpetrator of various crimes is established by sufficient evidence and supported by the weight of the evidence where it is based on eyewitness identification and/or the presence of the defendant's DNA recovered from items at the scene of the crimes. For the following reasons, we affirm Martin's convictions.

{¶2} The present appeal arises from the consolidation of separate criminal prosecutions. For the sake of clarity, each prosecution and the assignments of error relative thereto will be discussed separately.

*Lake County C.P. No. 16 CR 000593*

{¶3} On July 13, 2016, the Lake County Grand Jury indicted Kevin L. Martin for two counts of Failure to Comply with Order or Signal of Police Officer (Counts 1 and 2), felonies of the third degree in violation of R.C. 2921.331(B); two counts of Having Weapons while Under Disability (Counts 3 and 4), felonies of the third degree in violation of R.C. 2923.13(A)(2); Receiving Stolen Property (Count 5), a felony of the fourth degree in violation of R.C. 2913.51(A); Improperly Handling Firearms in a Motor Vehicle (Count 6), a felony of the fourth degree in violation of R.C. 2923.16(B); Possession of Heroin (Count 7), a felony of the fifth degree in violation of R.C. 2925.11; three counts of Aggravated Possession of Drugs (Counts 8, 11, and 12), felonies of the fifth degree in violation of R.C. 2925.11; two counts of Possessing Criminal Tools (Counts 9 and 10), felonies of the fifth degree in violation of R.C. 2923.24; Possessing

2

Drug Abuse Instruments (Count 13), a misdemeanor of the first degree in violation of R.C. 2925.12; Possession of Marijuana (Count 14), a minor misdemeanor in violation of R.C. 2925.11; Driving Under Financial Responsibility Law Suspension or Cancellation (Count 15), an unclassified misdemeanor in violation of R.C. 4510.16(A); and Reckless Operation (Count 16), a minor misdemeanor in violation of R.C. 4511.20(A). Counts 2, 5, 7, 8, 9, 10, 11, and 12 included Firearm Specifications pursuant to R.C. 2941.141. Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12 included Forfeiture Specifications pursuant to R.C. 2941.1417 and 2981.04.

{¶4} On July 15, 2016, Martin was arraigned and entered a plea of "Not Guilty" to the charges in the Indictment.

{¶5} On October 11, 2016, Martin filed a pro se Motion to Disqualify Counsel. A hearing on the Motion was held on the same day as it was filed and the trial court denied the Motion, finding "insufficient cause to disqualify counsel."

{¶6} At a pretrial on November 1, 2016, Martin made an oral pro se request for a continuance to retain new counsel. The trial court denied the request after contacting new counsel who advised that he had not been retained by Martin and would not be prepared to represent him by the scheduled trial date.

{¶7} Between November 7 and 9, 2016, a jury trial was held. Prior to trial, the State dismissed Counts 5 (Receiving Stolen Property), 13 (Possessing Drug Abuse Instruments), 14 (Possession of Marijuana), 15 (Driving Under Financial Responsibility Law Suspension or Cancellation), and 16 (Reckless Operation). The remaining counts were renumbered Counts 1 through 11. During trial, the State amended Count 6 (Possession of Heroin – Count 7 of the Indictment) to a felony of the fourth degree.

3

Also prior to trial, Martin indicated that he wanted to plead guilty to Count 1 (Failure to Comply) but the trial court refused to accept the plea.

{¶8} The following testimony was presented on behalf of the State.

{¶9} Officer James Smith of the Wickliffe Police Department testified that, on October 7, 2015, at approximately 1:30 p.m., he encountered a red-maroon minivan travelling westbound on Route 2 near the Lloyd Road exit. Smith stopped the minivan. As he was approaching the vehicle on foot, it drove away. Smith returned to his cruiser and pursued it onto I-90.

{¶10} The minivan exited at Euclid Avenue and continued driving west at a high rate of speed, striking several other vehicles in its flight. The pursuit continued down side streets to St. Clair Avenue and, eventually, to Glen Avenue in Cleveland. Officer Smith testified:

> And the driver of the vehicle began to stand on the frame of the door, of the door window. The window frame of the driver's door. And was standing up on it for just a few seconds, traveling about 35, 40 miles per hour. And then the driver jumped out of the car and did a couple flips and landed in the grass on the side of the road. And the driverless vehicle continued to go forward through an intersection, ran over a postal service mailbox, and smashed into a handicap ramp at somebody's residence in front of their house, and came to a stop on the side of the house.

{¶11} Officer Smith arrested Martin at the scene. The minivan had been purchased that same day by Jackie Martin, whom Martin claimed was his mother.[1]

{¶12} Officer Randy Veri of the Wickliffe Police Department assisted Officer Smith in the pursuit of Martin and corroborated his identification of Martin as the driver of the minivan.

---

1. The incident described as occurring on October 7, 2015, forms the basis of Count 1 (Failure to Comply). The remaining charges (Counts 2 through 11) are based on events occurring on June 1, 2016, described hereafter.

4

{¶13} Officer David Cook of the Wickliffe Police Department participated in the pursuit of Martin on October 7. Cook identified the make of the minivan as a Buick and its vehicle identification number (VIN) as 5GADV23L35D200652.

{¶14} Kyle Barnard was a resident of the Willo Vu Apartments in Eastlake on June 1, 2016. At approximately 11:30 that evening, he noticed a silver Cadillac parked outside his apartment occupied by an elderly gentleman ("late 40's, early 50's") and a younger blond woman. About five minutes later, a red vehicle arrived, and the woman left the Cadillac and entered and exited the red vehicle. Suspicious about the activity, Barnard contacted the police.

{¶15} Officer Paul Stanley of the Eastlake Police Department testified that, on June 1, 2016, he responded to a report of a suspicious vehicle at the back of the Willo Vu Apartments. Stanley had exited his police cruiser when the sound of a maroon-colored minivan starting drew his attention. Stanley approached the driver's side door as the minivan drove in reverse. He smacked the rear door a couple of times and told the driver to stop. The driver, identified as Martin, turned his head, made eye contact with the officer, and gestured for the officer to wait a moment. Martin put the minivan in drive and drove around the back of the apartment building, through a narrow yard area bordered by a chain link fence separating the Willo Vu apartments from an adjoining apartment complex (Spring Crest Apartments in Willowick).

{¶16} Officer Stanley lost sight of Martin and returned to his cruiser. After searching Vine Street and the adjoining apartment complex, Stanley returned to Willo Vu and found Martin on foot crossing the parking lot. With the assistance of another

5

officer, he was able to place Martin under arrest. A search of Martin's person yielded "a small straw wrapper sized piece of plastic with a white powder inside."

{¶17} Patrolman Richard Isabella of the Eastlake Police Department responded to a report of a suspicious vehicle in flight at the Willo Vu apartments. He located the abandoned minivan crashed into the fence behind the apartment buildings. The driver's door was open, and the passenger side of the vehicle was wedged against the fence. On the driver's seat, Isabella found a Glock handgun and a black bag or pouch containing crack cocaine. On the ground near the door, he found a cell phone.

{¶18} Patrolman Isabella then heard the sound of horns coming from the apartment complex on the other side of the fence. At this time, "a young black male wearing a white t-shirt," identified as Martin, "jumped on top of the fence," making eye contact with Isabella. Martin asked whose minivan that was, and Isabella replied, "yours." Martin jumped down and ran around the apartment buildings. Isabella pursued on foot until Martin was apprehended as described by Officer Stanley. Isabella seized two hundred and three dollars plus change from Martin's person.

{¶19} Officer Kenneth Roberts of the Eastlake Police Department arrived at the Willo Vu Apartments on the night of June 1, 2016, as Officer Stanley was ordering the driver of the maroon minivan to stop. Roberts described the driver as a "black male * * * wearing a white t-shirt" and identified him as Martin. When Martin began his flight by driving the minivan back around the apartment buildings and then south towards Vine Street, Roberts drove back to the apartments' entrance to anticipate Martin's arrival. However, he received a dispatch that the minivan had crashed into the fence separating the Willo Vu Apartments from the Spring Crest Apartments.

**{¶20}** Officer Roberts located the minivan with the driver's door ajar and the Glock, cell phone, and "a little black change type purse" as described by Patrolman Isabella. The purse contained crack cocaine, heroin, Suboxone, twelve Vicodin pills, and two Narcan pills. He then heard Isabella yelling for somebody to stop and saw Martin jump the fence and run around the apartment buildings before being taken into custody.

**{¶21}** A subsequent search of the minivan produced the following additional items: a baggie with marijuana in the driver's door handle; a baggie with a brown substance on the driver's floor board; latex gloves; syringes; a police scanner; and a red backpack containing a PTAC rifle in two pieces, two magazines for the rifle and two magazines for the Glock; and a .40 caliber Perfecta shell casing.

**{¶22}** Officer Roberts determined that the minivan was owned by Martin's mother and had the VIN number 5GADV23L35D200652.

**{¶23}** Dr. Karen Zavarella, a forensic analyst at the Lake County Crime Laboratory, performed DNA analysis on samples taken from the minivan, the Glock, and the PTAC rifle. The minivan contained DNA from two contributors with an exceedingly high probability that Martin was one of the contributors and the most abundant contributor.[2] Similarly, the Glock contained DNA from three contributors with a very high probability of Martin being one of the contributors as well as the most abundant contributor.[3] The results of the analysis of the PTAC rifle were inconclusive.

---

2. For the minivan, it was four trillion times more likely that Martin was one of the contributors than if the sample derived from two unknown contributors.
3. For the Glock, it was thirteen billion times more likely that Martin was one of the contributors than if the sample derived from three unknown contributors.

{¶24} Kimberly Gilson, a forensic analyst at the Lake County Crime Laboratory, performed controlled substance analysis on various substances recovered from Martin's person and the minivan. The white powder recovered from Martin's person was identified as 0.12 grams of N-ethylpentylone (Schedule I). The marijuana found in the driver's side door of the minivan was confirmed to be marijuana (Schedule I) in the amount of 2.36 grams. The substances in the black purse were identified as: 7.62 grams of pyrilamine, acetaminophen, and caffeine; 1.21 grams of heroin (Schedule I); 5.11 grams of hydrocodone and acetaminophen (Schedule II); 0.79 grams of buprenorphine and naloxone (Schedule III); and 0.06 grams of buprenorphine and naloxone (Schedule III). The baggie from the floor board contained 1.03 grams of heroin (Schedule I) and fentanyl (Schedule II).

{¶25} Raymond Jorz, a forensic analyst at the Lake County Crime Laboratory, performed fingerprint and firearm analyses on samples and evidence recovered from the minivan. Four prints were able to be taken from the minivan and, of these four, three were identified as belonging to Martin and the fourth to an unidentified individual. Jorz determined that both the Glock and PTAC rifle were operable firearms.

{¶26} Detective Theodore Kroczak testified that he took a buccal swab from Martin.

{¶27} The jury returned the following verdicts: "guilty" of two counts of Failure to Comply with Order or Signal of Police Officer (Counts 1 and 2), two counts of Having Weapons while Under Disability (Counts 3 and 4), Improperly Handling Firearms in a Motor Vehicle (Count 5), fourth-degree Possession of Heroin (Count 6), three counts of Aggravated Possession of Drugs (Counts 7, 10, and 11); and "not guilty" of two counts

8

of Possessing Criminal Tools (Counts 8 and 9). The jury made the further finding that Martin "had a firearm on or about his person or under his control" during the commission of the Possession offenses (Counts 6, 7, 10, and 11) and one of the Failure to Comply offenses (Count 2).

{¶28} On December 21, 2016, a sentencing hearing was held. The trial court merged Count 4 with Count 3 and merged the Firearm Specifications in Counts 7, 10, and 11 with the Specification for Count 6. The court sentenced Martin to serve one year in prison for each Firearm Specification to be served consecutively with each other and his sentence for the other charges. The court sentenced Martin to a consecutive thirty-six month prison sentence for Count 1 (Failure to Comply), consecutive twelve month prison sentences for Counts 2 (Failure to Comply) and 3 (Having Weapons while Under Disability), a concurrent twelve-month prison sentence for Count 5 (Improperly Handling Firearms), and eight month prison sentences for Counts 6, 7, 10, and 11 (Possession) to be served concurrently with each other but consecutively to the other sentences. Thus, Martin received an aggregate prison sentence of seven years and eight months. The court further suspended Martin's driver's license for life, ordered the forfeiture of seized items, ordered Martin to pay court costs and the costs of prosecution, and advised Martin that he could be subject to three years of post-release control.

{¶29} On December 30, 2016, Martin's sentence was memorialized in a Judgment Entry of Sentence.

{¶30} On January 12, 2017, Martin filed a Notice of Appeal from Lake County C.P. No. 16 CR 000593 (App. No. 2017-L-005). Relative to this appeal, Martin raises the following assignments of error:

{¶31} "[1.] The trial court erred when it did not permit Martin to plead guilty to count one, failure to comply, and permitted the jury to hear evidence on that charge."

{¶32} "[2.] The trial court erred when it did not grant Martin's motion to disqualify appointed counsel, filed on October 11, 2016."

{¶33} "[3.] The trial court committed plain error when it did not sever count one of the indictment in case no. 16 CR 000593 from the remaining counts."

{¶34} "[6.] In Case No. 16 CR 000593, the jury verdicts were against the manifest weight of the evidence because Martin was not identified as the perpetrator."

{¶35} "[7.] In Case No. 16 CR 000593, the evidence was insufficient because Martin was not identified as the perpetrator in counts 2-11."

{¶36} In the first assignment of error, Martin argues the trial court erred by prohibiting him from pleading guilty to Count 1, Failure to Comply based on the events of October 7, 2015.

{¶37} On the day of trial, before jury selection, Martin indicated that he wished to plead guilty to Count 1. The matter was considered in chambers. Following jury selection, Martin's offer to plead was put on the record. The State responded that it was "not even made aware that the Defendant wished to plead guilty to Count 1 until the jury had been sitting out in the hallway for almost an hour, and the State is intending to use the evidence of Count 1, would have been able to use [it] even if he did plead guilty, based on motive, intent, lack of mistake."

{¶38} The trial court denied the motion, concurring with the State that the evidence for Count 1 would have been admissible to show "motive, opportunity, identification, absence of mistake, and such." The court further cited "fairness to the

10

jurors" and "judicial economy," noting that a plea could have been accomplished prior to the day of trial and the start of trial was behind schedule. Finally, the court asserted that Martin did not "have a right to plead guilty."

{¶39} The trial court is correct that "[t]here is, of course, no absolute right to have a guilty plea accepted," and "[a] court may reject a plea in exercise of sound judicial discretion." *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.E.2d 427 (1971). Martin contends the rejection of his plea constitutes an abuse of discretion because the evidence for Count 1 would not have been admissible as other acts evidence under Evidence Rule 404(B) in his prosecution for the remaining Counts.

{¶40} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B); *State v. Allen*, 73 Ohio St.3d 626, 632, 653 N.E.2d 675 (1995) ("Evid.R. 404(B) allows 'other acts' evidence as proof of identity"). For example, the fact that the defendant had previously stolen a Glock pistol was admissible in a subsequent murder prosecution involving the same pistol "as proof of identity in that it clearly helped link [the defendant] to the gun found in his possession when he was arrested." *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 24.

{¶41} Here, the evidence of the October 7, 2015 incident was probative of Martin's involvement in the June 1, 2016 incident in that it established Martin's identity as the operator of a vehicle of which he was not the owner. Moreover, evidence of the prior incident is evidence of a certain modus operandi in that it demonstrates the

11

recklessness Martin has exhibited when fleeing from police. *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994) ("[a] certain *modus operandi* is admissible not because it labels a defendant as a criminal, but because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator").

{¶42} Martin contends that the State would not have been able to use the evidence of the October 7, 2015 incident because it "never provided any notice of intent to use 404(B) evidence" as required by the Rule. Evid.R. 404(B) ("the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial"). The argument has no merit. The State was not actually proffering the evidence related to the October 7, 2015 incident as other acts evidence but as substantive evidence of Martin's guilt for the charges related to that incident. Consideration of its admissibility as other acts evidence was hypothetical and only relevant in respect to whether Martin should have been allowed to plead guilty to Count 1.

{¶43} We find no abuse of discretion in the trial court's refusal to allow Martin to plead in light of the circumstances relied upon by the court: Martin made his offer on the day trial was to begin despite having the opportunity to do so earlier; the State was unaware that Martin desired to plead and opposed accepting the plea; and the evidence supporting the charge to which Martin desired to plead would have been admissible in the trial of the remaining charges. Martin was offered nothing in consideration for his plea and would not have gained any advantage at trial by having pled. The only practical result of allowing Martin to plead to Count 1 would have been further delay in the proceedings.

12

**{¶44}** The first assignment of error is without merit.

**{¶45}** Related to Martin's first assignment of error is his argument under the third assignment that the trial court committed plain error by not severing Count 1 from the remaining Counts in the Indictment.

**{¶46}** The joinder of multiple offenses in a single indictment is favored by law and is provided for by Criminal Rule 8. *State v. Thomas*, 61 Ohio St.2d 223, 225, 400 N.E.2d 401 (1980) ("[j]oinder conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries"). "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." Crim.R. 14.

**{¶47}** The defendant "has the burden of affirmatively showing that his rights were prejudiced" by the joinder of offenses. *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus. The State may refute a claim of prejudice by showing that "one offense could have been introduced under Evid.R. 404(B) at the trial of the other offense," and/or "that evidence of each of the crimes joined at trial is simple and direct." (Citation omitted.) *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 30.

**{¶48}** Typically, a court's refusal to separate charges for trial is reviewed under an abuse of discretion standard. *Torres* at 343. Here, the standard of review is plain

error inasmuch as Martin did not seek severance or otherwise object to the joinder. *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 22. "To successfully assert that a trial court committed plain error, a defendant must show an error that constitutes an obvious defect in the trial proceedings and demonstrate that the error affected the outcome of the trial." *Id.* at ¶ 23.

{¶49} Martin's claim of prejudice with respect to joinder is the same that he raised with respect to offering to plead to Count 1:

> Martin indicated before trial that he wanted to plead guilty to Count One of the indictment. The trial judge denied this request, indicating that the jury was waiting. At that point, the trial judge should have ordered that the remaining counts be tried separately from Count One. The State admitted that the purpose of trying Count One, despite Martin's offer to plead guilty, was to bolster the charges in the remaining counts. As a result, Martin was convicted of everything, and faced lengthy, and consecutive prison terms. The trial court should have recognized the inherent unfairness in this situation and granted him a separate trial on Count One.

Appellant's brief at 31.

{¶50} Assuming, arguendo, that Martin advances a colorable claim of prejudice, the claim is effectively refuted by the facts that the evidence of the October 7, 2015 and June 1, 2016 incidents are simple and direct and, as demonstrated by the preceding assignment of error, the evidence of the October 7, 2015 incident would have been admissible as other acts evidence in a trial of the June 1, 2016 incident. In *State v. Jackson*, 11th Dist. Lake No. 2017-L-140, 2018-Ohio-3241, this court affirmed a single prosecution for separate robberies where "the perpetrator drove the same or a similar vehicle" and there were other "similarities in the way the crimes were committed": "Evidence of either robbery would have been admissible at a trial on the other under

Evid.R. 404(B) since the 'other act' tended to establish a similar plan as well as the perpetrator's identity." *Id.* at ¶ 25.

{¶51} It should also be noted that the standard for the admissibility of "other acts" evidence is "stricter" than the standard for the joinder offenses. *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). However, "when simple and direct evidence exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)." *Id.* Thus, even if the evidence of the October 7, 2015 incident were inadmissible in a separate trial of the charges arising from the June 1, 2016 incident, joinder would still be proper given the simple and direct nature of the evidence regarding the two incidents. *State v. Stoutamire*, 11th Dist. Trumbull No. 2007-T-0089, 2008-Ohio-2916, ¶ 55 (joinder of offenses was not improper where "the state presented witnesses and evidence chronologically according to the dates of the incidents").

{¶52} The third assignment of error is without merit.

{¶53} In his second assignment of error, Martin contends the trial court erred when it denied his Motion to Disqualify Counsel in light of the "irreconcilable differences between counsel and Martin."

{¶54} On October 11, 2016, the trial court held a hearing on Martin's Motion to Disqualify Counsel. Martin complained that appointed counsel was not diligently advocating on his behalf:

> I feel as though my appointed attorney feels that I have no chance at trial, and I feel like it's not even the fact he feels I have no chance, but I feel like he doesn't want to * * * even put his effort into representing me, because I got a lot going on. I brought him plenty of good arguments, and I did a lot of research on my own case on my own behalf, and he shoots down everything I say. Everything

15

that I bring him he tells me that it's either erroneous or frivolous. * * * I don't want to represent myself, but I'm saying I got a good chance at trial with my case.

{¶55} Martin cited further instances where he felt counsel disregarded his wishes regarding the presentation of his defense: he believed the evidence was legally insufficient to support the charge of Failure to Comply arising from the June 1, 2016 incident; he wanted to sever Count 1 of the Indictment arising from the October 7, 2015 incident; with respect to Lake County C.P. No. 16 CR 000633 (discussed *infra*), he wanted phone records subpoenaed and a private investigator hired to build a case against his cousin as the actual perpetrator; he did not believe the State had provided full and complete discovery; he did not wish to entertain the plea bargain counsel urged him to accept; and trial counsel had previously represented a woman who was a potential witness against him.

{¶56} At the November 1, 2016, pretrial, Martin represented that his family was retaining private counsel to represent him and that he refused to communicate with appointed counsel. The trial court contacted the attorney whom Martin indicated his family was seeking to retain and he advised the court he had represented Martin in prior cases and had spoken with his family regarding the pending charges. However, the attorney stated that he had not been retained or even contacted by Martin's family for over ten days and he did not anticipate being retained.

{¶57} A trial court's decision denying a request for new or substitute counsel "is reviewed under an abuse-of-discretion standard." *State v. Cowans*, 87 Ohio St.3d 68, 73, 717 N.E.2d 298 (1999); *State v. Burrell*, 11th Dist. Lake No. 2013-L-024, 2014-Ohio-1356, ¶ 21.

16

**{¶58}** "Where, during the course of his trial for a serious crime, an indigent accused questions the effectiveness and adequacy of assigned counsel * * *, it is the duty of the trial judge to inquire into the complaint and make such inquiry a part of the record." *State v. Deal*, 17 Ohio St.2d 17, 244 N.E.2d 742 (1969), syllabus. "The trial judge may then require the trial to proceed with assigned counsel participating if the complaint is not substantiated or is unreasonable." *Id.*

**{¶59}** Before a defendant is entitled to the discharge of appointed counsel, "the defendant must show a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." *State v. Coleman*, 37 Ohio St.3d 286, 525 N.E.2d 792 (1988), paragraph four of the syllabus. An indigent defendant's right to counsel, however, does not encompass counsel of his or her choice nor does it guarantee a "meaningful relationship" or a "rapport" between the defendant and counsel. *State v. Murphy*, 91 Ohio St.3d 516, 523, 747 N.E.2d 765 (2001); *State v. Henness*, 79 Ohio St.3d 53, 65, 679 N.E.2d 686 (1997). "Accordingly, the existence of hostility or a personal conflict between the attorney and the defendant does not constitute a total breakdown so long as it does not inhibit the attorney from both preparing and presenting a competent defense." (Citation omitted.) *State v. Long*, 2014-Ohio-4416, 19 N.E.3d 981, ¶ 35 (11th Dist.).

**{¶60}** Martin maintains that "it was clear that [he] and his attorney had reached a point in their relationship where they were no longer speaking to each other about the evidence or formulating a defense together." Appellant's brief at 27. We disagree. Nowhere in the course of the October 11, 2016 hearing is it apparent that Martin's and appointed counsel's conflicting views as to how the defense should be conducted

17

inhibited or compromised counsel's ability to present a defense. *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 150 ("[d]isagreement[s] between the attorney and client over trial tactics or approach also do not warrant a substitution of counsel") (citation omitted). At this point, the charges had been pending for three months and trial was scheduled in less than a month. Martin and appointed counsel had been communicating to this point and counsel demonstrated an understanding of the positions Martin was advocating. Martin's subsequent refusal to communicate with his attorney over the issue of what clothing to wear at trial did not materially impact trial strategy and appears to have been motivated by Martin's mistaken belief that his family was in the process of retaining new counsel.

{¶61} We further note that Martin failed to substantiate the need for a private investigator. Although he presented his cousin as the actual perpetrator of the crimes charged in Lake County C.P. No. 16 CR 000633, Martin conceded that he only suspected his cousin's involvement, did not know if his cousin would be willing to accept responsibility for the crimes, and "he [his cousin] didn't admit exactly on the phone that he did it." If Martin could substantiate the allegations against his cousin, a colorable claim of ineffective assistance could possibly be raised. The mere fact of the allegations, however, does not entitle Martin to substitute counsel. *Compare Long* at ¶ 34 ("the courts of this state have recognized three examples of good cause which would warrant the discharge of court-appointed counsel: (1) a conflict of interest; (2) a complete breakdown of communication; and (3) an irreconcilable conflict which could cause an apparent unjust result") (citation omitted).

{¶62} The second assignment of error is without merit.

18

**{¶63}** In his sixth and seventh assignments of error, Martin challenges the sufficiency and manifest weight of the evidence with respect to his identification as the perpetrator of the crimes occurring on June 1, 2016 (Counts 2 to 11).

**{¶64}** The manifest weight of the evidence and the sufficiency of the evidence are distinct legal concepts. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 44. With respect to the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**{¶65}** Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "In other words, a reviewing court asks whose evidence is more persuasive -- the state's or the defendant's?" *Id.* An appellate court considering whether a verdict is against the manifest weight of the evidence must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

19

**{¶66}** With respect to the sufficiency of the evidence, Officers Stanley and Roberts both positively identified Martin as the operator of the maroon minivan. Their identifications constitute legally sufficient evidence that Martin was in fact the perpetrator of the crimes on June 1, 2016.

**{¶67}** With respect to the manifest weight of evidence, the identification of Martin as the operator of the minivan was corroborated by Martin's apprehension at the scene and the presence of his DNA on the minivan and the Glock. There was also evidence that Martin was the only operator of the minivan, which he had used on October 7, 2015, in a reckless flight from the police, and had arrived alone at the Willo Vu Apartments.

**{¶68}** Against this evidence it can be argued that Willo Vu resident, Barnard, observed a young blond woman enter and exit the minivan. Barnard testified she was carrying a cell phone when she entered the minivan and she exited the minivan just before Officer Stanley gave the command to stop. Officer Stanley reported seeing "a female reclined back in the passenger seat of the vehicle," without being able to describe the female. Officer Roberts did not notice any other occupants of the vehicle except for Martin. No witnesses could testify as to what happened to the female and the silver Cadillac after the arrival of the police. The presence of the female raises an issue as to whether either the drugs or the guns in the minivan could have been hers. The weight of the evidence does not support such an inference. The more likely scenario (and the one consistent with the jury's verdicts), is that the purpose of her presence at Willo Vu Apartments was to purchase drugs from Martin.

**{¶69}** The sixth and seventh assignments of error are without merit.

**{¶70}** On August 8, 2016, the Lake County Grand Jury indicted Martin for Burglary (Count 1), a felony of the second degree in violation of R.C. 2911.12(A)(1); Failure to Comply with Order or Signal of Police Officer (Count 2), a felony of the fourth degree in violation of R.C. 2921.331(B); Receiving Stolen Property (Count 3), a felony of the fourth degree in violation of R.C. 2913.51(A); Safecracking (Count 4), a felony of the fourth degree in violation of R.C. 2911.31; Possessing Criminal Tools (Count 5), a felony of the fifth degree in violation of R.C. 2923.24; Vandalism (Count 6), a felony of the fifth degree in violation of R.C. 2909.05(A); and Vandalism (Count 7), a felony of the fifth degree in violation of R.C. 2909.05(B)(1)(a).

**{¶71}** On August 12, 2016, Martin was arraigned and entered a plea of "Not Guilty" to the charges in the Indictment.

**{¶72}** On November 28 and 29, 2016, a jury trial was held. Prior to trial, the State dismissed Counts 2 (Failure to Comply), 3 (Receiving Stolen Property), and 7 (Vandalism). The remaining counts were renumbered Count 1 through 4. The State further amended Count 4 (Vandalism – Count 6 of the Indictment) to delete "[t]he value of said property or the amount of physical harm is less than $5,000.00."

**{¶73}** The following testimony was presented on behalf of the State:

**{¶74}** Geraldine Mastroberti testified that, on March 13, 2016, she arrived at the Shoregate Sunoco gas station/mini mart on Lakeshore Boulevard in Willowick to open the store. Shortly after her arrival, a vehicle backed into the store through two large windows (a converted garage bay). A man exited the vehicle and began to put a chain around an ATM machine located in the store. The man was dressed in black with a

21

hoodie and gloves. Mastroberti exited the store to call the police and heard the driver of the vehicle say, "hurry up, we gotta get out of here." She went to her car and called the police. She saw the vehicle exit westbound on Lakeshore as police arrived and began pursuit.

**{¶75}** Sergeant Robert Prochazka of the Willowick Police Department responded to a report of a break-in in progress at the Sunoco on Lakeshore at about 6:00 a.m. on March 13, 2016. Driving westbound on Lakeshore, Prochazka observed a dark-colored van with one functioning taillight, the passenger side door ajar, and the rear hatch "smashed up." The van made a sharp turn southbound on Lloyd Road and began to accelerate. From Lloyd the van turned onto Forestview and entered a Euclid housing development.

**{¶76}** The van came to a stop in the front yard of a residence on Sycamore Drive. The driver and occupant of the van fled on foot behind the residence. Sergeant Prochazka examined the van and noted that the steering column and ignition tumbler had been removed. After contacting the owner of the van, it was determined that it had been stolen some time since the previous evening.

**{¶77}** The video from Sergeant Prochazka's dashcam was played for the jury. In the video, two individuals can be seen exiting the van and fleeing through a gate behind the residence. The driver can be seen wearing a grey hoodie. The passenger can be seen wearing a dark jacket, alternatively described as black and purple.

**{¶78}** Patrolman Brian Kravos of the Willowick Police Department participated in the pursuit of the fleeing van and of the suspects on foot thereafter. Kravos followed a trail left by the suspects of "various fences that had clearly been smashed down from

22

somebody going over them" and "a couple of gates that were actually either open or broken." In a yard on Willow Drive, Kravos found a "dark purple jacket" and "black t-shirt" in close proximity to each other. He noted that the clothing was dry despite the fact it had been raining.

{¶79} Patrolman Steven Fellinger of the Willowick Police Department processed the van involved in the incident, a maroon Plymouth Voyager, collecting fingerprints and DNA samples. Items collected from the van included: a backpack with a white t-shirt and a pair of tennis shoes, a six and a half foot length of cable, a roll of green wire, a paving brick, a tan Intech bag, a box with shotgun shells, and glass shards from the driver's side floor board, passenger side floor board, and the rear cargo area of the vehicle.

{¶80} Detective Gregory Spakes processed the crime scene at the Sunoco, collecting fingerprints and DNA samples from the scene as well as the van.

{¶81} Michael Rajko, the owner of the Sunoco, testified that the cost of repairing the mini mart was fourteen thousand dollars.

{¶82} Leanne Suchanek, an assistant laboratory director for the Lake County Crime Lab, performed DNA analysis on the jacket and t-shirt found on Willow Drive as well as items collected from the van. The jacket yielded a DNA profile that was a mixture of at least four people and the t-shirt yielded a DNA profile that consisted of at least two contributors. For each item there was an exceedingly high probability of Martin being one of the contributors.[4] Both the jacket and the t-shirt had a common majority contributor, i.e., a contributor who yielded a higher amount of DNA than the

---

4. For the jacket, it was 961 billion times more likely that Martin was one of the contributors than if the mixture derived from four unknown contributors. For the t-shirt, it was 47.8 quadrillion times more likely that Martin was one of the contributors than if the mixture derived from two unknown contributors.

23

other contributors. Suchanek identified Martin as the majority contributor to both items. With respect to the t-shirt, "there was such a small amount of minor contributor DNA * * * that [it] would never be able to make any kind of comparison to any individual."

{¶83} DNA samples taken from the interior of the van indicated three contributors but excluded Martin as well as the owner of the van. A DNA sample taken from a chain and cable recovered from the van revealed at least two contributors but excluded Martin as well as the owner of the van. Two cigarette butts taken from the van were analyzed and revealed a single DNA profile of which Martin was excluded from being the source.

{¶84} The jury returned "guilty" verdicts to all charges.

{¶85} On December 21, 2016, a sentencing hearing was held. The trial court merged Count 4 (Vandalism) with Count 1 (Burglary). The court sentenced Martin to serve five years in prison for Count 1 (Burglary), twelve months in prison for Count 2 (Safecracking), and twelve months in prison for Count 3 (Possessing Criminal Tools). The court ordered the sentences to be served concurrently with each other but consecutively with the sentence imposed in Lake County C.P. No. 16 CR 000593. Between the two cases, Martin received an aggregate prison sentence of twelve years and eight months. The court advised Martin that post-release control was mandatory for three years and ordered him to pay court costs and costs of prosecution.

{¶86} On January 12, 2017, Martin filed a Notice of Appeal from Lake County C.P. No. 16 CR 000633 (App. No. 2017-L-006). Relative to this appeal, Martin raises the following assignments of error:

{¶87} "[4.] In Case No. 16 [CR] 000633, the jury verdicts were against the manifest weight of the evidence because Martin was not identified as the perpetrator."

{¶88} "[5.] In Case No. 16 CR 000633, the evidence was insufficient because Martin was not identified as the perpetrator."

{¶89} In these assignments of error, Martin contends that his convictions were against the manifest weight of the evidence and/or unsupported by sufficient evidence because "Martin was never identified as either the driver or the man putting the chain around the ATM." Moreover, "[t]he jury lost its way when it put undue weight on the DNA found on the jacket and tee shirt, especially considering that there were other contributors of DNA to those items." Appellant's brief at 34.

{¶90} The standards for reviewing the sufficiency of the evidence and the manifest weight of the evidence have been set forth above as part of our analysis of the sixth and seventh assignments of error. Since Martin's convictions in the present case rest on circumstantial evidence, we note:

> Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction.

*Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus

{¶91} The determinative issue with respect to Lake County C.P. No. 16 CR 000633 is the sufficiency of the evidence. There is little uncertainty or doubt as to Mastroberti's testimony, the content of the dashcam video, or the results of the DNA analysis.

25

{¶92} Mastroberti described the person who placed the chain around the ATM as wearing dark clothing and gloves. Her testimony also identifies him as a passenger in the van. The passenger exiting the van in the video matches Mastroberti's description, in particular by the dark jacket worn by the passenger. Although the passenger cannot be identified from the video, his general appearance is not inconsistent with Martin's appearance. The DNA evidence overwhelmingly connects Martin with the jacket and the shirt recovered from the scene and thus is sufficient to identify him as the passenger in the van. Samples from the shirt were taken from the neck and armpits. Of two possible contributors, Martin was the majority contributor and so little of the minority contributor's DNA was present that there was no realistic possibility of ever identifying the minority contributor. The only reasonable inference is that Martin was wearing both the shirt and jacket, although the DNA evidence cannot determine this conclusively.

{¶93} Such evidence has often been held sufficient to support convictions:

> DNA evidence identifying a defendant as a major contributor to the DNA profile found on an object linked to a crime is sufficient evidence to sustain a conviction. [*State v.*] *Brown*[, 8th Dist. Cuyahoga No. 98881, 2013-Ohio-2690,] ¶ 31, 35 (concluding that Brown's convictions were based on sufficient evidence because his DNA profile was the major contributor to the DNA profile discovered on a shirt connected to the crimes even though the DNA profile on the shirt also revealed the DNA of unidentified minor contributors); *State v. Crabtree,* 9th Dist. Summit No. 24946, 2010-Ohio-2073, ¶ 17, 19 (concluding that a rational trier of fact could have concluded that Crabtree committed the crimes because his DNA was consistent as the major contributor to the DNA profile discovered on a gun that was connected to the crimes); *State v. Bridgeman,* 2d Dist. Champaign No. 2010 CA 16, 2011-Ohio-2680, ¶ 16, 18 (concluding that a reasonable trier of fact could have concluded that Bridgeman committed the bank robbery because DNA testing of a ski mask and glove connected to the robbery revealed Bridgeman as the major contributor to the DNA profile

26

discovered on the glove and the ski mask). *See also State v. Johnson,* 5th Dist. Stark No. 2012 CA 00054, 2012-Ohio-5621, ¶ 25 (concluding that "the jury could have concluded that [Johnson] and his cohort invaded the home" because Johnson's DNA was discovered on a hat that the victim identified as the hat "worn by the man who held the gun to his head").

*State v. Eckard*, 3d Dist. Marion No. 9-15-45, 2016-Ohio-5174, ¶ 33.

**{¶94}** The fourth and fifth assignments of error are without merit.

**{¶95}** For the foregoing reasons, Martin's convictions in Lake County C.P. No. 16 CR 000593 and Lake County C.P. No. 16 CR 000633 are affirmed. Costs to be taxed against the appellant.

THOMAS R. WRIGHT, P.J., concurs with a Concurring Opinion,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

_____

THOMAS R. WRIGHT, P.J., concurs with a Concurring Opinion.

**{¶96}** Under the first assignment, I do not decide whether evidence regarding the October 2015 chase is admissible under Evid.R. 404(B) for purposes of establishing Martin's guilt in the June 2016 fleeing incident as there are independent reasons to affirm.

**{¶97}** Under the fourth assignment, the lead opinion does not expressly decide Martin's manifest weight argument. I conclude for the reasons stated in the lead opinion

27

that the conviction is both supported by sufficient evidence and is not against the manifest weight of the evidence.

_____

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

{¶98} I respectfully dissent.

{¶99} It is this writer's position that appellant's first and third assignments of error are interrelated and are dispositive of this appeal.

{¶100} Regarding his first assignment, it is within the sound discretion of the trial court whether to accept or refuse a guilty plea. *State v. Yates*, 11th Dist. Ashtabula No. 2014-A-0044, 2015-Ohio-3087, ¶31, 37. Although a defendant has no constitutional right to have a guilty plea accepted, the court's discretion is not without limits. *State v. Caldwell*, 8th Dist. Cuyahoga No. 99166, 2013-Ohio-5017, ¶10-11. The term "abuse of discretion" is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record. *State v. Ferranto,* 112 Ohio St. 667, 676-678 (1925). An abuse of discretion may be found when the trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland,* 176 Ohio App.3d 401, 2008-Ohio-1720, ¶15 (8th Dist.).

{¶101} Regarding his third assignment, appellant did not file a motion to sever. "Under Crim.R. 52(B), however, this court has the power to recognize plain error or defects involving substantial rights even if they are not brought to the attention of the

28

trial court. *State v. Moreland* (1990), 50 Ohio St.3d 58, 62 (* * *)." "'In the context of a criminal case, a court of review should invoke the plain error doctrine with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Jenks* (1991), 61 Ohio St.3d 259, 282 (* * *); *State v. Long* (1978), 53 Ohio St.2d 91, (* * *), paragraph three of the syllabus; [*State v.*] *Holley*[, 11th Dist. Ashtabula No. 98-A-0089, 1999 WL 1313667,] at 26 [(Dec. 17, 1999)]. Thus, plain error does not exist unless, but for the error, the outcome of the proceeding would have been different. *Jenks* at 282 (* * *); *Moreland* at 62 (* * *); *Long* at paragraph two of the syllabus; *Holley* at 26–27.'"" *State v. Honzu*, 11th Dist. Trumbull No. 2016-T-0056, 2017-Ohio-626, ¶52-53.

**{¶102}** There are a few key factors in this case which would favor the trial court holding a plea hearing. Crim.R. 11(C) requires a court to advise a defendant who pleads guilty or no contest to a felony charge that he is waiving his right to a jury trial, his right to confront witnesses, his right to have compulsory process for obtaining witnesses, his right against self-incrimination, and his right to require the state to prove his guilt beyond a reasonable doubt. *See State v. Watkins*, 99 Ohio St.3d 12, 2003-Ohio-2419, ¶6.

**{¶103}** On the day of trial and before jury selection, defense counsel informed the court that appellant wished to enter a guilty plea to count one, failure to comply with order or signal of police officer, for the incident that occurred on October 7, 2015. The state, which over-indicted appellant in this matter, indicated however that it would present evidence relating to that count whether or not a plea was entered as Evid.R.

404(B) evidence. The court denied appellant's request and stated the following on the record:

{¶104} "Alright. As to the Defendant's offer to plead guilty to Count 1, I heard argument in chambers on that. The State would use all of the evidence pertaining to Count 1 anyway, as other acts that would show motive, opportunity, identification, absence of mistake, and such. Also, that could have been accomplished last week. I had people in the courtroom. It takes 45 minutes to do a change of plea. The jurors were waiting outside for an hour. Sheriff didn't get the Defendant over until significantly past 8:30, and I wasn't going to encumber the jury's, the juror's time even more. As it is, it's 1 o'clock. We normally have jurors seated by noon. So in the interest of judicial economy and the, in fairness to the jurors - - also, the Defendant doesn't have a right to plead guilty. He has a right to a fair trial. And I don't see anything in the Constitution that mandates that he plead guilty as charged." (Case No. 2016 CR 000593, Jury Trial T.p. 134-135).

{¶105} The facts and circumstances establish the trial court abused its discretion in not accepting appellant's plea as to count one. "[I]t is incumbent upon the Court to discern the reasonableness of the Defendant's decision to enter a plea of guilty under the circumstances." *See State v. Franklin*, 2d Dist. Greene No. 2004 CA 127, 2005-Ohio-6832, ¶9. It is up to a defendant to enter a guilty plea of his own free will and choice. *See* U.S. Constitution, Amendment Six; Crim.R. 11; *State v. Ingram*, 6th Dist. Sandusky No. S-16-046, 2017-Ohio-5685, ¶12.

{¶106} This writer stresses that the count at issue, count one, was the only count that occurred on October 7, 2015. The other counts stem from the incident that took

30

place eight months later on June 1, 2016. The state admitted that the purpose of presenting evidence on count one was to prove motive, opportunity, lack of mistake, intent, and identity. Thus, the state wanted to present the evidence occurring on October 7, 2015 because the evidence would bolster the state's case on the June 1, 2016 incident. The state, however, did not provide any notice of intent to use 404(B) evidence.

{¶107} Evid.R. 404(B) states in part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."

{¶108} Similarly, R.C. 2945.59 provides:

{¶109} "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

**{¶110}** "Evidence of other acts under R.C. 2945.59 and Evid.R. 404(B) is to be construed against admissibility. * * * This is because '(t)he average individual is prone to much more readily believe that a person is guilty of the crime charged if it is proved to his satisfaction that the defendant has committed a similar crime.' * * *" (Footnote citations omitted.) *State v. Burns*, 11th Dist. Lake No. 2000-L-189, 2002-Ohio-3585, ¶16.

**{¶111}** "'[C]ourts have long recognized the danger of admitting other-acts evidence. In *United States v. Phillips* (1979), 599 F.2d 134, 136, the Sixth Circuit Court of Appeals stated as follows: 'Two concerns are expressed by the first sentence of (Fed.R.Evid.) 404(b): (1) that the jury may convict a "bad man" who deserves to be punished—not because he is guilty of the crime charged but because of his prior or subsequent misdeeds; and (2) that the jury will infer that because the accused committed other crimes, he probably committed the crime charged.' As cautioned by the Ohio Supreme Court in *State v. Lowe* (1994), 69 Ohio St.3d 527, * * *, 'we therefore must be careful (* * *) to recognize the distinction between evidence which shows that a defendant is the *type* of person who might commit a particular crime and evidence which shows that a defendant *is* the person who committed a particular crime.' (Emphasis sic.) *Id.* at 530. This danger is particularly high when the other acts are very similar to the charged offense * * *.'" *Lyndhurst v. Smith*, 8th Dist. Cuyahoga No. 97045, 2012-Ohio-2920, ¶26, quoting *State v. Williams*, 195 Ohio App.3d 807, 2011-Ohio-5650, ¶37-38 (8th Dist.) (en banc) (parallel citation omitted.)

**{¶112}** "In addition, other-acts evidence is subject to the limitations provided in Evid.R. 402 and 403; therefore, the proffered evidence must be relevant and its probative value must outweigh its potential for unfair prejudice." *Smith, supra,* at ¶27.

**{¶113}** As this court stated in *State v. Plevyak*, 11th Dist. Trumbull No. 2013-T-0051, 2014-Ohio-2889, ¶16-19:

**{¶114}** "The state asserted at oral argument that Evid.R. 404(B) does not require notice to the defendant of these 'other acts' as they are inextricably interwoven with the essential facts of the case. The state argued that these 'other acts were blended; essentially part and parcel of the crimes charged and therefore no notice was required. We disagree.

**{¶115}** "Several of these 'other acts' involved acts that occurred weeks and months apart from the crimes with which [the defendant] was charged. Under Evid.R. 404(B) other acts may be admissible to show the background of the crimes with which a defendant is charged, or when the other acts are '"inextricably related" 'to those crimes. *State v. Lowe,* 69 Ohio St.3d 527, 531 * * *, quoting *State v. Curry,* 43 Ohio St.2d 66, 73 * * *(1975). That these 'other acts' are inextricably interwoven with the primary facts in the case goes to the issue of their admissibility-not whether the state was required to provide notice to the defendant under Evid.R. 404(B).

**{¶116}** "The state also averred at oral argument that open file discovery provided [the defendant] with knowledge of the 'other acts' evidence and this was equivalent to giving him notice of the state's intent to use this evidence. Again, we disagree. There is a difference between a defendant knowing the state possesses 'other acts' evidence and a defendant knowing the state intends to use it at trial. A defendant's decision to go

forward at trial may well depend on what evidence the state intends to introduce. If providing discovery alone were sufficient to satisfy the notice requirements of Evid.R. 404(B) the rule would be superfluous. Statutes and rules are to be construed so as to avoid such unreasonable or absurd results. *State ex rel. Asti v. Ohio Dept. of Youth Servs.,* 107 Ohio St.3d 262, * * *, 2005-Ohio-6432, ¶28.

{¶117} "The federal rule, upon which Evid.R. 404(B) is based, requires reasonable notice of the general nature of these 'other acts' in order to prevent unfair surprise. *Lucas, supra.* Whether notice is 'reasonable' will depend on the facts and circumstances of each case." (Parallel citations omitted.)

{¶118} In determining whether to permit other acts evidence to be admitted, trial courts should conduct a three-step analysis set forth in *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695: "The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R. 403." *Id.* at ¶20.

{¶119} In the case at bar, the record establishes that appellant was prejudiced by the state's use of evidence against for which he was willing and desired to plead guilty. This lead to a fundamentally unfair process where appellant was forced to have a jury

34

who heard acts occurring on October 7, 2015 during a trial for acts occurring eight months later on June 1, 2016. The other acts evidence was not relevant and its probative value was substantially outweighed by the danger of unfair prejudice. *Williams, supra,* at ¶20. In light of the foregoing, this writer concludes appellant should have been afforded a plea hearing and was denied a fair trial because of the admission of prejudicial other acts evidence.

{¶120} In addition, as stated, count one, failure to comply with order or signal of police officer, occurred on October 7, 2015. The remaining counts occurred on June 1, 2016, eight months later.

{¶121} Crim.R. 8(A), "Joinder of Offenses," states:

{¶122} "Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶123} Crim.R. 14, "Relief from prejudicial joinder," provides in part:

{¶124} "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires. * * *"

**{¶125}** "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992). However, pursuant to Crim.R. 14, it may be necessary to separate trials to prevent prejudice. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶29.

**{¶126}** To prevail on a motion to sever, "the defendant has the burden of demonstrating three facts. He must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." *Schaim, supra,* at 59.

**{¶127}** "'[A] defendant who asserts that joinder is improper has the burden of making an affirmative showing that his rights will be prejudiced thereby.' *State v. Roberts,* 62 Ohio St.2d 170, 175 * * *(1980). Prejudice is not demonstrated if the offense in question would have been admissible as 'other acts' evidence under Evid.R. 404(B) or if the evidence of each crime joined at trial is simple and direct." *State v. Irby*, 11th Dist. Trumbull No. 2015-T-0018, 2015-Ohio-5467, ¶89, citing *Schaim, supra,* at 59. (Parallel citation omitted.)

**{¶128}** Again, appellant indicated before trial his desire to plead guilty to count one. The facts presented establish the trial court abused its discretion in not affording appellant a plea hearing or permitting him to plead guilty. *See Franklin, supra,* at ¶9; U.S. Constitution, Amendment Six; Crim.R. 11; *Ingram, supra*, at ¶12. This was the

only count that occurred on October 7, 2015. The other counts stem from the incident that took place on June 1, 2016.

{¶129} The trial court instead denied appellant's request indicating that the jury was waiting. The trial court should have ordered that the remaining counts be tried separately from count one. The state admitted that the purpose of trying count one, despite appellant's offer to plead guilty, was to bolster the charges in the remaining counts. As a result, appellant was convicted of everything and faced lengthy and consecutive prison terms. The trial court should have permitted appellant to plead guilty to count one, and/or should have recognized the inherent unfairness and prejudice to appellant and granted him a separate trial on count one.

{¶130} This writer finds merit in appellant's first and third assignments of error and, thus, further finds his remaining assignments moot. App.R. 12(A)(1)(c).

{¶131} I respectfully dissent.